**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| RAYMOND GONZALES, KATHERINE PAPPAS, ADAM PORTER, and MADELYN EDER, *on behalf of themselves and all similarly situated individuals*,<br><br>Plaintiff,<br><br>v.<br><br>WESTMINSTER MANAGEMENT, L.L.C., WILLIAMSBURG SPOTSWOOD LLC, and FAIR OAKS OWNER, LLC,<br><br>Defendants. | Civil Action No. 1:26-cv-1022 |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs Raymond Gonzales, Katherine Pappas, Adam Porter, and Madelyn Eder, on behalf of themselves and all other similarly situated individuals, file this Class Action Complaint against Defendants Westminster Management LLC ("Westminster Management" or "Westminster"), Williamsburg Spotswood LLC ("Spotswood"), and Fair Oaks Owner, LLC ("Fair Oaks"), and allege as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. Over the last decade, businesses have increasingly utilized "junk fees" to boost their profits. Junk fees are commonly defined as "add-on charges that provide little to no value in exchange" for the price. Luke Herrine, *Unfairness, Reconstructed*, 42 Yale J. on Reg. 95, 122 (2025). Businesses use these fees to slowly drive-up the cost on consumers (and the profits for themselves)—often in an unfair, illegal and deceptive manner. As the Federal Trade Commission recently explained, "[m]isleading fees are prohibited," and businesses "can't lie about the fees

you charge."[1] Instead, businesses must "[t]ell the truth when it comes to fee-related information that matters, like what's being charged and why." *Id*.

2. This case arises because Defendant Westminster Management (a property management company), in collusion with its clients, Spotswood and Fair Oaks (the "Landlord Defendants"), did not tell the truth about certain fees imposed on tenants at the properties they own and manage throughout the Commonwealth of Virginia. Defendants also charged fees prohibited by Virginia law. Defendants engaged in this scheme to increase their profits while advertising their units at a lower rental price, thereby luring unsuspecting consumers into leases packed with additional fees for services their rental payments are already supposed to guarantee. As multiple reports have now found, this practice has only compounded the rent burden on low- and middle-income Americans, depriving them of the financial mobility needed to advance up the socioeconomic ladder.[2] These additional fees also compound the eviction crisis.

---

[1] Federal Trade Commission, *Getting to the bottom line: The FTC's bipartisan Junk Fees Rule and your business*, available at: https://www.ftc.gov/business-guidance/blog/2024/12/getting-bottom-line-ftcs-bipartisan-junk-fees-rule-your-business.

[2] *See Federal Data Shows Many Virginians are 'Rent Burdened'*, Va. Public Radio (Sept. 24, 2025), https://www.wvtf.org/news/2025-09-24/federal-data-shows-many-virginians-are-rent-burdened (reporting based on federal data that "four out of 10 people who are renting in Virginia cannot realistically afford their rent" and descriving Virginia's "outsized eviction rate"); *see also Nearly Half of Renter Households are Cost-Burdened, Proportions Differ by Race*, U.S. Census Bureau (Sept. 12, 2024), https://www.census.gov/newsroom/press-releases/2024/renter-households-cost-burdened-race.html (last visited Oct. 1, 2025)

3. As federal data has shown, these fees add up to create a disproportionate burden on Virginians—particularly low- and middle-income Virginians—that deprives them of funds to pay other expenses, to save for a home, and to move up the socioeconomic ladder.[3]

4. This case arises from Defendants' deceptive and unlawful conduct in imposing and collecting a $95- to $99-per-month "Media Service Amenity Fee," (also called a "Bulk Media Fee," or "Media Amenity Fee," and hereinafter, the "Media Fee"), a $20- to $35-per-month "Community Fee," and a onetime-per-lease "Admin Fee" of $300 to $350 (collectively, the "Disputed Fees") that Defendants represent as necessary for each tenant to receive safe, habitable, and sanitary dwelling units, and as simply reimbursing the actual costs to it of providing such services, but that are in fact a deceptive junk fee that do not cover the services Defendants claims to be covered, and that are not lawful under Virginia law in any event.

5. Westminster is no stranger to lawsuits over these junk fees. Just last year, it settled a lawsuit related to one of its Virginia properties (The Manor/Manor East Apartments) over the same Media Fee charged to tenants at those locations, many of whom were already receiving subsidized internet for as little as $10 a month but were now forced to pay what was then $90 per month for the same services. *See Blanco v. Leesburg Manor Owner, LLC*, No. 1:24-cv-1045-CMH-WEF, ECF No. 12 (E.D. Va.). Instead of getting rid of the Media Fee, however, Westminster has doubled down, increasing the fee to upwards of $99 a month for Plaintiffs and other similarly situated tenants at its Virginia properties.

---

[3] See *Federal Data Shows Many Virginians are 'Rent Burdened*', Va. Public Radio (Sept. 24, 2025), https://www.wvtf.org/news/2025-09-24/federal-data-shows-many-virginians-are-rent-burdened; *Nearly Half of Renter Households are Cost-Burdened, Proportions Differ by Race*, U.S. Census Bureau (Sept. 12, 2024), https://www.census.gov/newsroom/press-releases/2024/renter-households-cost-burdened-race.html (last visited Oct. 1, 2025).

6. But as Defendants are by now all too aware, the Media Fee unlawfully charges tenants for television services when the Landlord Defendants are not themselves the providers of those services, in violation of Va. Code § 55.1-1222 ("No landlord shall demand or accept any such payment from any tenants in exchange for such [television] service unless the landlord is itself the provider of the service, nor shall any landlord discriminate in rental charges between tenants who receive any such service and those who do not.").

7. In further violation of this provision, upon information and belief and based on prior discovery, Defendants also receive kickbacks from the actual cable television providers at their respective properties in the form of bulk discounts that allow Defendants to reap significant profits from the Media Fee, which is intentionally set far above the actual costs of the services they claim tenants are paying for. *See* Va. Code § 55.1-1222 ("No landlord of a multifamily dwelling unit shall demand or accept payment of any fee, charge, or other thing of value from any provider of cable television service, cable modem service, satellite master antenna television service, direct broadcast satellite television service, subscription television service, or service of any other television programming system in exchange for granting a television service provider mere access to the landlord's tenants or giving the tenants of such landlord mere access to such service.").

8. For example, Plaintiff Gonzales's lease agreement at Fair Oaks states that he must pay $99 per month for internet and cable services, when in fact his landlord, Fair Oaks, is charged far less than that amount on a per unit basis to deliver those services.

9. The revenue collected by Defendants from the Media Fee is significant. At Fair Oaks, alone, which has 364 units, Westminster and Fair Oaks rake in nearly $40,000 per month,

or $480,000 per year, in Media Fees, yet, upon information and belief and based on prior discovery, they pay far less than this amount to deliver the services they claim tenants must pay for. And at Spotswood Commons—where Plaintiffs Pappas, Porter, and Eder reside—Westminster and Spotswood collect approximately $20,000 per month, or $240,000 per year, in Media Fees.

10. The Media Fee is just the tip of the iceberg, for Defendants also charge Plaintiffs and other tenants $20-35 per month for a "Community Fee," which they represent in form lease agreements is for "service to [each tenant's] dwelling." However, upon information and belief and based on prior discovery, the Fee covers no services provided directly to the tenants' dwelling units but instead covers costs that the Landlord Defendants—and Westminster on their behalf—are already obligated to provide under Virginia's statutory warranty of habitability, namely: safe, sanitary, and accessible common areas. *See* Va. Code § 55.1-1220(A) (requiring landlords to, in relevant part, "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition"; "[k]eep all common areas shared by two or more dwelling units of a multifamily premises in a clean and structurally safe condition"; and "provide and maintain appropriate receptacles and conveniences for the collection, storage, and removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of dwelling units and arrange for the removal of the same"); *Parrish v. Vance*, 898 S.E.2d 407, 411–14 (Va. Ct. App. 2024) (holding that a landlord could not shift the burden to deal with insect infestations to their tenant through a lease agreement, because Va. Code. § 55.1-1220(A) provides tenants a warranty of habitability that cannot be waived through an agreement).

11. Westminster and Fair Oaks, and other landlords at Westminster's Virginia properties, also assess a onetime "Admin Fee" of $300 to $350 that, upon information and belief and based on discovery in similar tenant fee cases, serves no purpose other than generating additional profits for Defendants.

12. Defendants impose these Disputed Fees through form lease agreements that Westminster Management generates, designs, and determines based on the desired budgetary outcomes of its clients, including Spotswood and Fair Oaks, who ultimately approves the form lease agreement and fees to assess at their respective properties. Westminster Management, Spotswood, and Fair Oaks each personally participate in, approve, and decide upon the language of the form lease agreements published to Plaintiffs and the putative class members defined below.

13. Upon information and belief, Westminster Management uses substantially the same lease agreement and utility addendums at all of the properties it manages in Virginia, with the only difference being the amount and title of the Disputed Fees charged at each property. The form lease agreements approved and published to Plaintiffs and the class members by Defendants contain uniform misrepresentations that are materially indistinguishable from property to property, such that all of the tenants at Virginia properties managed by Westminster Management are affected in the same manner by its misconduct. For this reason, Plaintiffs brings this action not only on their own behalf, but on behalf of other tenants of Westminster Management properties in Virginia who were charged and paid the same unlawful and deceptive fees.

14. Defendants have engaged in and continue to engage in a scheme that induces the tenants in the properties it manages into a residential lease that misrepresents their rights to certain services—guaranteed under Virginia law—and forces them to waive such rights, and that also deceptively generates profits for Defendants in return for little or none of the promised services. Living with the harm of having paid, and continuing to pay, Defendants' unfair and deceptive fees, Plaintiffs are forced to bring this lawsuit to seek relief for Defendants' ongoing violations of the Virginia Consumer Protection Act ("VCPA") and Virginia Residential Landlord Tenant Act ("VRLTA").

**JURISDICTION AND VENUE**

15. This Court has jurisdiction under 28 U.S.C. § 1332(d) because Plaintiffs and putative class members (Virginia) and Defendants (Delaware, New Jersey, and New York) are each citizens of different states and the amount in controversy exceeds $5,000,000 exclusive of interest and costs. Under 28 U.S.C. § 1332(d)(6), "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000." The test for determining whether the amount in controversy is "the pecuniary result to either party which [a] judgment would produce." *Dixon v. Edwards,* 290 F.3d 699, 710 (4th Cir. 2002) (quoting *Gov't Employees Ins. Co. v. Lally,* F.2d 568, 569 (4th Cir.1964)). Statutory damages "are properly includable in the calculation of the jurisdictional amount," including increased damages for willful violations. *See Bartnikowski v. NVR, Inc.*, 307 F. App'x 730, 735 (4th Cir. 2009). Attorney's fees may also be included in the amount in controversy when recoverable under the asserted statute. *Missouri State Life Ins. Co. v. Jones,* 290 U.S. 199,

202 (1933) (holding that where a state statute provides for the award of attorney's fees, those fees can be considered as part of the amount in controversy).

16. Here, Westminster Management has at least 2,672 units among its nine Virginia properties, meaning that there are at least 2,672 putative class members (before counting any co-tenants in each unit) in Count One, which seeks relief for all persons who signed a lease with landlords of Virginia properties managed by Westminster Management.

17. In Count One, which alleges violations of the VCPA, Plaintiffs and each class member are entitled to at least $1,000 per month for each month that Westminster Management willfully collected the Disputed Fees, which, upon information belief, have been charged in full or in part for a least two years. This entitles Plaintiffs and the class members to at least a total of $24,000 per class member as of the date of this Complaint, or $64,128,000 ($24,000 x 2,672 class members) for the class, which will continue to increase by $1,000 per class member each month that this case proceeds and additional Disputed Fees are collected. Va. Code § 59.1-204; *see Broglie v. MacKay-Smith*, 541 F.2d 453, 455 (4th Cir. 1976) (holding future damages may be included in this calculation when "'a right to future payments . . . will be adjudged in the present suit.'" (quoting 1 Moore's Federal Practice P 0.93(5. 3) at 904)); *Goff v. Jones*, 47 F. Supp. 2d 692, 695 (E.D. Va. 1999) (Lee, J.) (future damages could be considered in deciding amount in controversy). This is before considering the attorney's fees that the Court could award under the VCPA. Va. Code § 59.1-204(B).

18. Even if limited to only Plaintiffs' two properties, moreover, the number of class members in Count One would be at least 576, which would provide a minimum possible statutory damage award in Count One of $13.824 million for just one of the Disputed Fees,

assuming a willful violation, and a minimum possible statutory damages award of $6.912 million for a non-willful violation.

19. The Court also has jurisdiction over all other claims under at least 28 U.S.C. § 1367 because they each arise from the same case or controversy as Count One.

20. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and Division, where Plaintiff Gonzales resides and property owned and/or managed by Defendants is located.

## PARTIES

21. Plaintiff Ray Gonzales is a natural person residing in this Division and District. At all times relevant to this Complaint, he has been a tenant at Fair Oaks.

22. Plaintiff Katherine Pappas is a natural person residing in this District. At all times relevant to this Complaint, she has been a tenant at Spotswood Commons.

23. Plaintiff Adam Porter is a natural person residing in this District. At all times relevant to this Complaint, he has been a tenant at Spotswood Commons.

24. Plaintiff Madelyn Eder is a natural person residing in this District. At all times relevant to this Complaint, she has been a tenant at Spotswood Commons.

25. Defendant Westminster Management is a limited liability company incorporated in New Jersey with its principal place of business in New Jersey. Westminster Management is the property manager at Plaintiffs' respective properties, as well as the following residential apartment complexes in Virginia: District 757, Garden Springs, Lumen, River House, Seminary Towers, Apartments at the Sycamores, and the Manor/Manor East Apartments.

26. Defendant Westminster Management is a "supplier" under the VCPA because it is a "seller, lessor . . . or professional . . . who advertises, solicits, or engages in consumer transactions"—namely, the management and leasing of apartments for personal, family, or household purposes. Va. Code § 59.1-198.

27. Westminster Management is the entity that collects the Disputed Fees, and it is liable for its misrepresentations to Plaintiffs and the putative class members that they owe, and that it can collect, such fees. Westminster Management is also individually liable for its own misconduct in deciding to charge, charging, and collecting the Disputed Fees, and in determining and publishing the language in the form lease agreements that deceives Plaintiffs and the putative class members.

28. And as explained above, Westminster Management decides the terms of the form leases published to Virginia consumers, including Plaintiffs, and its employees are the ones who sign the lease agreements, including the lease agreements with Plaintiffs in this case.

29. Westminster Management's direct role in deciding on the leases that are ultimately published to consumers—as well as which Fees are collected—is confirmed by the fact that it provides addenda in each form lease that represent that Westminster Management is the author of the addendum. Westminster is also the party that provides a "Resident Handbook" to each of the tenants at its Virginia properties along with their lease agreements.

30. Westminster Management is individually liable for misrepresentations it made ostensibly on behalf of its landlord clients. *See Stitt v. Nautilus Enters., Inc.*, 17 Va. Cir. 150, at *2 (1989) (finding that officers and agents of a corporate entity can be held liable under the VCPA for their own misconduct).

31. Defendant Williamsburg Spotswood LLC is a limited liability company incorporated in Delaware with its principal place of business in New York.

32. Spotswood is a "supplier" under the VCPA because it is a "seller, lessor . . . or professional . . . who advertises, solicits, or engages in consumer transactions"—namely, the leasing of apartments for personal, family, or household purposes. Va. Code § 59.1-198. Spotswood is liable for its misrepresentations to Plaintiffs Pappas, Porter, and Eder and the putative class members that they owe, and that it can collect, such fees.

33. Spotswood is also a "landlord" as defined by the VRLTA, as it is the owner and lessor of the dwelling units at the Spotswood Commons apartments, of which Ms. Pappas, Mr. Porter, and Ms. Eder are tenants.

34. Defendant Fair Oaks Owner, LLC is a limited liability company incorporated in Delaware with its principal place of business in New York.

35. Fair Oaks is a "supplier" under the VCPA because it is a "seller, lessor . . . or professional . . . who advertises, solicits, or engages in consumer transactions"—namely, the leasing of apartments for personal, family, or household purposes. Va. Code § 59.1-198. Fair Oaks is liable for its misrepresentations to Plaintiff Gonzales and the putative class members that they owe, and that it can collect, such fees.

36. Fair Oaks is also a "landlord" as defined by the VRLTA, as it is the owner and lessor of the dwelling units at the Courts at Fair Oaks apartments, of which Mr. Gonzales is a tenant.

## FACTS

### *Plaintiff Gonzales's Lease Agreement with Fair Oaks*

37. Plaintiff Raymond Gonzales is a resident of Fairfax, Virginia, where he is a tenant at the Courts at Fair Oaks apartments.

38. For several years, and within the last two years, Mr. Gonzales's lease agreements with Fair Oaks, which were drafted and published to him by Westminster Management and approved by Fair Oaks, have included provisions requiring him to pay a $80 to 99-per-month Media Fee, a $20-per-month Community Fee, and a onetime "Admin Fee" of $350 per lease.

39. Mr. Gonzales's form lease agreement includes a standard "Media Service and Amenity Addendum" (or "Media Addendum")—drafted and published by Westminster and approved by Fair Oaks—that states that Mr. Gonzales and the other tenants at Fair Oaks must pay $99 (previously $80) per month for certain "Standard Amenities," which are defined by the Media Addendum as "High speed Internet service in the leased unit"; "one wireless cable modem or router"; "Cable Television service"; and "2 Set Up Box(es)" for the cable television.

40. Nowhere in the Addendum do Defendants Westminster or Fair Oaks disclose to Mr. Gonzales and his fellow tenants that the Media Fee also generates a profit for them and far exceeds the actual costs of the Standard Amenities for which they require their tenants to pay almost $100 each month. Instead, Westminster and Fair Oaks intentionally mislead tenants into believing that the Media Fee simply covers the actual costs of the Standard Amenities, and they mandate that tenants pay the Fee "at the same time and on the same terms as Lessee's rent payment" or they will face "any available remedies under law," including suspension of the services or even eviction.

41. In addition to the Media Fee, Westminster and Fair Oaks also assess a $20-per-month Community Fee to Plaintiff Gonzales and his co-tenants in a form "Utility and Services Addendum," which claims that Community Fee is a "utility."

42. In the form Utility and Services Addendum, Westminster and Fair Oaks state that Mr. Gonzales and his co-tenants must pay the Community Fee to cover "service(s) to [their] dwelling." The Addendum later states that the flat rate Community Fee is a "fair and reasonable" estimation for the "services provided." And the Addendum claims that the Community Fee is merely an "allocat[ion]" of the "bills . . . billed by the service provider to [Defendants]."

43. Westminster and Fair Oaks also assess and collect from Mr. Gonzales and his co-tenants a onetime-per-lease $350 "Admin Fee," which is disclosed only in the lease Cover Sheet and is not authorized or otherwise described by any other provision of the lease or Virginia law.

44. Upon information and belief and based on prior discovery in similar tenant fee cases, Westminster and Fair Oaks insert this additional fee to generate pure profit, without little to no services actually provided to their tenants in return for the Fee. Instead, the Admin Fee is a pure "junk fee."

45. Indeed, Mr. Gonzales and his co-tenants are already paying monthly rent that is designed to cover the administrative costs of managing the property, so there is no need for the Admin Fee other than to allow Westminster and Fair Oaks to reap additional profits on the backs of consumers without increasing the sticker rental price that they advertise to the public.

46. In doing so, by their design, Westminster and Fair Oaks can lure more consumers into applying for tenancies at their properly, only to turn around and add additional charges and

fees like the Admin Fee after they have already been accepted and paid the nonrefundable application fee.

47. Pursuant to the terms of his lease agreement, each month in at least the past two years, Mr. Gonzales has paid to Westminster and Fair Oaks a $20-per-month Community Fee, a $80 to 99-per-month Media Fee, and an a $350 Admin Fee.

***Plaintiffs Pappas's, Porter's, and Eder's Lease Agreements***

48. Plaintiffs Pappas, Porter, and Eder (collectively, the "Spotswood Plaintiffs") are tenants at the Spotswood Commons apartment complex in Williamsburg, Virginia, which is managed by Westminster and owned by Spotswood.

49. Within the last two years, the Spotswood Plaintiffs' lease agreements with Spotswood, which were drafted and published to them by Westminster Management and approved by Spotswood, have included provisions requiring them to pay a $95- to $99-per-month Media Fee, a $30- to $35-per-month Community Fee, and a onetime "Administrative Fee" of $300 per lease.

50. Like Plaintiff Gonzales, the Spotswood Plaintiffs' form lease agreement includes a standard Media Addendum—drafted and published by Westminster and approved by Spotswood—that states that they and the other tenants at Spotswood Commons must pay a $95-99 per month for certain "Standard Amenities," which are defined by the Media Addendum as "High speed Internet service in the leased unit"; "one wireless cable modem or router"; "Cable Television service"; and "2 Set Up Box(es)" for the cable television.

51. Nowhere in the Addendum do Defendants Westminster or Spotswood disclose to the Spotswood Plaintiffs or their fellow tenants that the Media Fee also generates a profit for

them and far exceeds the actual costs of the Standard Amenities for which they require their tenants to pay almost $100 each month. Instead, Westminster and Spotswood intentionally mislead tenants into believing that the Media Fee simply covers the actual costs of the Standard Amenities, and they mandate that tenants pay the Fee "at the same time and on the same terms as Lessee's rent payment" or they will face "any available remedies under law," including suspension of the services or even eviction.

52. In addition to the Media Fee, Westminster and Spotswood also assess a $30-per-month Community Fee to the Spotswood Plaintiffs and their co-tenants in a form "Utility and Services Addendum," which claims that Community Fee is a "utility."

53. In the form Utility and Services Addendum, Westminster and Spotswood state that the Spotswood Plaintiffs and their co-tenants must pay the Community Fee to cover "service(s) to [their] dwelling." The Addendum later states that the flat rate Community Fee is a "fair and reasonable" estimation for the "services provided." And the Addendum claims that the Community Fee is merely an "allocat[ion]" of the "bills . . . billed by the service provider to [Defendants]."

54. Westminster and Spotswood also assess and collect from the Spotswood Plaintiffs and their co-tenants a onetime $300 "Administrative Fee" (or "Admin Fee"), which is disclosed only in the lease Cover Sheet and is not authorized or otherwise described by any other provision of the lease or Virginia law.

55. Upon information and belief and based on prior discovery in similar tenant fee cases, Westminster and Spotswood insert this additional fee to generate pure profit, without

little to no services actually provided to their tenants in return for the Fee. In other words, the Admin Fee is a pure "junk fee."

56. Indeed, the Spotswood Plaintiffs and their co-tenants are already paying monthly rent that is designed to cover the administrative costs of managing the property, so there is no need for the Admin Fee other than to allow Westminster and Spotswood to reap additional profits on the backs of consumers without increasing the sticker rental price that they advertise to the public.

57. In doing so, by their design, Westminster and Spotswood can lure more consumers into applying for tenancies at their properly, only to turn around and add additional charges and fees like the Admin Fee after they have already been accepted and paid the nonrefundable application fee.

58. Pursuant to the terms of their lease agreements, each month in at least the past two years, the Spotswood Plaintiffs have paid to Westminster and Spotswood a $30 to $35-per-month Community Fee, a $95 to $99-per-month Media Fee, and an a $300 Admin Fee.

***Defendants' Unlawful and Deceptive Media Fee***

59. Defendants' Media Fee is unlawful and deceptive for several reasons.

60. For one, the Virginia Residential Landlord Tenant Act explicitly states that "[n]o landlord shall demand or accept any such payment from any tenants in exchange for such [television] service unless the landlord is itself the provider of the service . . . ." Va. Code § 55.1-1222.

61. Despite this explicit language—and despite being sued for the same violation in the prior *Blanco* case before this Court—Westminster and its landlord clients, including the

Landlord Defendants, have knowingly required tenants in Virginia to pay the Media Fee for television services when none of the landlords are the actual providers of the service.

62. Indeed, the form Media Addendum states that "the service and equipment" for the Standard Amenities is provided by "Service Providers," which are defined as "third part[ies]." By definition, a "third party" is not the landlord, yet Defendants knowingly charge a Media Fee for television services that they are not themselves providing.

63. The Media Addendum also specifies that any issues with service or equipment should be addressed to a third party, OnBoard, which again is neither the Plaintiffs' or the putative class members' landlord nor has any corporate relationship to their landlords. OnBoard is also the company that tenants are directed to contact to set up their accounts "in order to receive the Standard Amenities."

64. The equipment to operate the cable television and internet (routers, cable box, etc.) is also provided by the third-party service providers; the landlords do not provide it.

65. The Addendum further disclaims any responsibility by the landlord at each property for "end user support for any amenities."

66. Accordingly, the landlords at Westminster's Virginia properties do not have any responsibility for providing, maintaining, or repairing the cable television and internet services, even though they require tenants to pay nearly $100 a month for those services.

67. In addition, the Landlord Defendants have also violated Va. Code § 55.1-1222 by accepting kickbacks from the third-party Service Providers in exchange for giving their tenants access to the television services covered by the Media Fee. *See id.* ("No landlord of a multifamily dwelling unit shall demand or accept payment of any fee, charge, or other thing of

value from any provider of cable television service, cable modem service, satellite master antenna television service, direct broadcast satellite television service, subscription television service, or service of any other television programming system in exchange for granting a television service provider mere access to the landlord's tenants or giving the tenants of such landlord mere access to such service.”).

68. Specifically, upon information and belief and based on prior discovery, the Landlord Defendants receive discounts for requiring all of their tenants to use the third-party provider’s services, which discounts are not passed on to the tenants.

69. Instead, as discovery will show, Defendants intentionally set the Media Fee at a price that is far higher than the per-unit cost of the services covered by the Fee, such that Defendants generate significant profits from the Media Fee that are never disclosed to the tenants. Instead, the Media Addendum deceptively represents that the Media Fee is paid in exchange for the Standard Amenities, when that is not the case.

70. Defendants are each aware of the fact that the Media Fee far exceeds the amounts they pay for the Standard Amenities, yet they knowingly assess the Fee at an amount they intentionally set (and increase) each year to meet certain budget objectives. They do so solely for their pecuniary gain and without regard to the right of Plaintiffs and other consumers to know the true use and purpose of the Media Fee under the Virginia Consumer Protection Act.

***Defendants’ Unlawful and Deceptive Community Fee***

71. The Community Fee assessed by Defendants is also unlawful and deceptive.

72. Indeed, the assessment of the Community Fee directly violates Virginia Law, which prohibits landlords from creating lease provisions that waive the warranty of habitability

established by Va. Code § 55.1-220(A). *See Parrish v. Vance*, 898 S.E.2d 407, 411–14 (Va. Ct. App. 2024) (holding that a landlord could not shift the burden to deal with insect infestations to their tenant through a lease agreement, because Va. Code. § 55.1-220(A) provides tenants a warranty of habitability that cannot be waived through an agreement).

73. Here, Defendants require their tenants to pay a monthly fee to cover, upon information and belief, common area maintenance including trash collection. However, the imposition of this Fee violates the Virginia Residential Landlord Tenant Act, which states that the "landlord shall", in relevant part: (1) "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition; (2) "[k]eep all common areas shared by two or more dwelling units of a multifamily premises in a clean and structurally safe condition"; (3) "[m]aintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by him"; (4) "[p]rovide and maintain appropriate receptacles and conveniences for the collection, storage, and removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of dwelling units and arrange for the removal of same." Va. Code § 55.1-1220(A).

74. Although a landlord and tenant may agree that *the tenant*, as an individual, "[k]eep all common areas . . . in a clean and structurally safe condition," Virginia law does not permit a landlord to shift its own costs of doing so onto the tenant—as Defendants have done here.

75. By shifting the burden to provide these basic necessities required under the statutory warranty of habitability, Defendants not only violated the VRLTA but also deceptively

misrepresented to Plaintiffs and the class members that they could lawfully assess the Community Fee and that the payment of the Fee is required to obtain what the law—and their rent payments—already guarantees, in violation of the VCPA. Va. Code § 59.1-200(14).

76. Despite the explicit obligations of Virginia law, of which they were well aware, Defendants knowingly forced Plaintiffs and all other similarly situated tenants to waive their right to the warranty of habitability guaranteed by the Virginia Residential Landlord Tenant Act, as the VRLTA expressly prohibits. Defendants shifted the obligation to maintain common areas onto its tenants and profited from the imposition of fees that they had no right to charge.

77. Regardless of the legality of the Community Fee under the VRLTA, moreover, the assessment of such fees is also deceptive for the independent reason that Defendants intentionally misrepresents the purpose and use of the Fee, which is not intended—and was never intended—to simply cover the costs of services to each "dwelling," as each form lease claims, but were in fact an additional profit generator that allowed Defendants to advertise lower rent prices before luring unsuspecting consumers into leases packed with additional, unlawful fees that generated profit for it and its landlord clients.

78. Although charging Plaintiffs and the tenants at Westminster's Virginia properties a $20- to $35-per-month Community Fee, upon information and belief and based on discovery in similar tenant junk fee cases, the actual costs of those services is far less than the amount of revenue generated by the Fee.

79. Indeed, at the Spotswood Commons complex, there are frequent issues with trash services, including overflowing dumpsters, and residents are even told to keep their trash inside

their residences until trash service resumes, causing trash bags to pile up inside their living space.

80. The Spotswood Plaintiffs have also observed and experienced several unaddressed problems in the common areas, including: large sinkholes on the property; thick ice on stairwells that is not removed; and issues with community safety, including car break-ins and slashed tires. Although alerted to all of these issues, Westminster and Spotwood have failed to address them, even though they collect approximately $80,000 per year in Community Fees.

81. Based on the lack of actual services provided to residents who pay the Community Fee, Plaintiffs suspect and allege that the Community Fee does not in fact cover the actual costs of providing safe and habitable common areas or trash services (or of even providing any services to tenants at all), as Defendants would have their tenants believe.

82. Instead, upon information and belief, Defendants imposed the Community Fee for the purpose of generating additional profit and did not intend—and never intended at the time they had Plaintiffs and the class members execute their lease agreements—to provide any actual services for the amount charged. Instead, Defendants intentionally charged fees that were far higher than any costs to them of providing the services—or that covered no services at all—so that they could generate additional profit for their own pecuniary gain.

83. Indeed, in similar tenant fee cases, Plaintiffs' counsel has learned that, as industry practice, landlords and property managers often set fees during the annual budget process based on so-called "market surveys," which show the types and amounts of fees charged at comparable apartment complexes. In other words, the fees are not set based on the actual costs or types of services purportedly covered by each fee, or even projected estimates of those costs,

but based solely (or at least in large part) on the maximum amounts that property managers and landlords can get away with based on market conditions.

84. Just considering the number of units at Fair Oaks (364) and Spotswood Commons (212), alone, for example, Defendants collect almost $8,000 a month in community fees at each property, or approximately $80,000 a year. Upon information and belief, the actual cost of these services is far lower, including because the services covered by the Community Fee are not actually provided within individual units, or even common areas.

***Defendants' Unlawful and Deceptive Admin Fee***

85. The onetime-per-lease Admin or "Administrative" Fee of $300-350 is also unfair and deceptive because it purports to cover services that it in fact does not directly cover. Thus, Defendants falsely claim that the Admin Fee has certain uses and benefits that it does not in fact have, in violation of at least Va. Code § 59.1-200(5) and (14).

86. For example, Westminster and Fair Oaks are collecting almost $130,000 per year in Admin Fees at the Fair Oaks complex, which purportedly covers some sort of administrative costs incurred in executing each lease (though its true purpose is intentionally concealed), but in fact, upon information and belief and based on discovery in similar tenant fee cases, is simply treated by Defendants as an additional revenue stream.

87. In other words, Defendants do not assess the Admin Fee to cover any actual costs for services provided to Plaintiffs and their co-tenants; the Fee is simply a revenue-generator that increases their profits.

***Defendants' Willfulness***

88. Defendants' acts and practices in violation of Virgina law have been willful.

89. Indeed, as mentioned above, Westminster has already been sued for the very deception and unlawful practices related to the Media Fee that are alleged here. Despite this lawsuit, which it settled after the claims survived a motion to dismiss, Westminster has knowingly continued to assess the Media Fee and has even increased it without disclosing either the substantial profits generated by the Fee or the unlawfulness of the Fee under the VRLTA.

90. Upon information and belief, through their business relationship with Westminster, the Landlord Defendants and the landlords at Westminster's other Virginia properties are also aware of the prior lawsuit involving the Media Fee and have been aware of the same since it was filed in 2024.

91. Upon information and belief, Defendants have also been aware of their obligations under the VRLTA, including the statutory warranty of habitability, and the 2024 decision in *Parrish* holding that those obligations cannot be shifted onto tenants. Despite this knowledge, Defendants have continued to assess the Community Fee.

92. Defendants' conduct has also been willful because they knowingly assessed fees that they represented had certain uses and benefits for their tenants, when in fact those fees were intentionally set by them at amounts far higher than the actual costs of the services covered by each fee (or set fees for services that they never intended to provide on the terms they represented) in order to drive up their profits and lure in additional tenants with lower rental prices.

93. Defendants also wanted to deliberately conceal the true use and purpose of each Fee, as it knew the fees violated the VRLTA and that if tenants were aware of the significant profits generated by each Fee they might organize to get rid of the Fees. Indeed, tenants at the Manor/Manor East apartments had previously organized to stop the Media Fee, so Westminster and its landlord clients were aware that similar organizing could and would occur if the true nature and superfluousness of the Disputed Fees were revealed or disclosed.

**COUNT ONE**
**VIOLATION OF VCPA, Va. Code § 59.1-200**
**(Class and Individual Claim by Plaintiffs against Defendant Westminster Management)**

94. Plaintiffs incorporate each of the preceding allegations.

95. Under Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of the following class of which they are each a putative class member:

> All persons who: (1) executed a lease at a property managed by Defendant Westminster Management and located in Virginia under which they (2) paid or were obligated to pay any of the Disputed Fees within the past two years.

96. **Numerosity. Fed R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. There are at least 2,672 class members based on the number of units at Westminster Management's Virginia properties. The class members' names and addresses can be identified through discovery, and the class members may be notified of the pendency of this action by published or mailed notice.

97. **Predominance of Common Questions of Law and Fact. Fed R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The

principal issues include: (1) whether Westminster made uniform misrepresentations and engaged in other unfair and deceptive practices in its form lease agreements in violation of the Act; (2) whether Westminster's violations were willful; and (3) the appropriate amount of damages for Westminster's violations.

98. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

99. **Adequacy of Representation. Fed R. Civ. P. 23(a)(4).** Plaintiffs are adequate class representatives because their interests coincide with, and are not antagonistic to, the putative class members' interests. They have retained experienced and competent counsel; they intends to continue to prosecute this action vigorously; they and their counsel will fairly and adequately protect the interests of the members of the class; and they and their counsel have no interest that might cause them to not vigorously pursue this action.

100. **Superiority. Fed R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to the other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the Court. Furthermore, individualized litigation presents a potential for inconsistent or contradictory

judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant Westminster Management's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

101. Defendant Westminster Management violated the VCPA, Va. Code § 59.1-200, by, at a minimum:

a. Representing to Plaintiffs and the putative class members that Defendants can charge, and Plaintiffs owe, a Community Fee, when in fact such services are guaranteed and unwaivable under the Virginia warranty of habitability as part of their right to a safe and habitable premises and clean and orderly common spaces;

b. Representing to Plaintiffs and the putative class members that Defendants can charge, and Plaintiffs owe, a Media Fee for television services, when in fact Virginia law prohibits landlords for charging for television services unless they are themselves the provider of the services;

c. Representing to Plaintiffs and the putative class members the Media Fee covers certain Standard Amenities, when in fact the Fee is set far higher than the costs of those services and in fact generates additional profits for Defendants that are never disclosed to Plaintiffs or the class members;

d. Representing to Plaintiffs and the class members that the Community Fee is merely for the cost of "service to [their] dwelling" units, when in fact

Defendants knew at the time they made such representation that the Community Fee did not cover services to the dwelling but in fact covered common area services and maintenance;

e. Representing to Plaintiffs and the putative class members that the Community Fee was merely a flat rate "allocat[ion]" of the "bills . . . billed by the service provider to us," when in fact Defendants knew at the time they made this representation that it each Fee was set not based on the actual costs of the services but based on the maximum possible profit Defendants could generate from the Community Fee;

f. Representing to Plaintiffs and the putative class members that Community Fee is a "fair and reasonable" estimation of the costs of the services covered by the Fee, when in fact Defendants knew at the time they made this representation that the Fee was set not based on the actual costs of the services but based on the maximum possible profit they could generate from the Fee based on surveys of market competitors;

g. Representing to Plaintiffs and the putative class members that the Community Fee and/or Admin Fee merely cover certain services—i.e., have certain uses and benefits—when in fact they are specifically set by Defendants at prices far higher than the actual costs of those services—or that cover no actual services at all; and,

h. Representing to Plaintiffs and the putative class members that the Community Fee is merely a "utility" that may be passed on to the tenants under Virginia law, when in fact that is not the case.

102. The above affirmative misrepresentations and material omissions constitute, at a minimum, violations of Va. Code 59.1-200(5) and (6), insofar as they misrepresent that the goods and services provided by the fees have certain qualities, characteristics, uses or benefits, or are of a particular standard, quality, grade, style, or model. They also constitute a "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction," in violation of Va. Code § 59.1-200(14).

103. The above misrepresentations and material omissions are not an aspect of a consumer transaction subject to the Virginia Residential Landlord Tenant Act, as the VRLTA does not cover the conduct at issue—i.e., making misrepresentations in lease agreements—including with respect to property managers like Westminster.

104. "The VCPA creates a new, statutory cause of action distinct from and in addition to common law fraud." *Ballagh v. Fauber Enters.*, 290 Va. 120, 124 (2015) (citing *Owens v. DRS Auto. Fantomworks, Inc.,* 288 Va. 489, 497, 764 S.E.2d 256, 260 (2014) ("[T]he legislative purpose underlying the VCPA was, in large part, to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by the common law.... Therefore, [it] extends considerably beyond fraud.")). The elements "of the two claims are [therefore] different." *Id.* The VCPA applies to *both* misrepresentations and fraudulent acts by landlords in relation to a lease agreement, as outlined in § 59.1-200. Va. Code § 59.1-199(5). With respect to misrepresentations under the VCPA, a plaintiff need only show (1) reliance and (2) damages. *In*

*re Lumber Liquidators Litig.*, No. 1:16-md-2743, 2017 WL 29111681, at *12-13 (E.D. Va. July 7, 2017) (Trenga, J.). There is no requirement that the plaintiff establish the defendant's knowledge of the falsity or an intent to deceive, though the plaintiff may seek damages for willful violations. *See id.*

105. Here, Plaintiffs and the putative class members relied on the representation that they were required to pay the Disputed Fees when they signed their lease agreements and agreed to pay and paid the fees in the amount provided under those agreements. Plaintiffs and the class members would not have paid the Disputed Fees but for Defendants' representation that they were owed and that they had certain uses and benefits.

106. Plaintiffs and the putative class members have been damaged by Westminster's misrepresentations and material omissions, including through payment of the Disputed Fees in reliance on Defendants' representation that they were owed and would have certain uses and benefits.

107. As set forth above, Westminster's violations were willful.

108. Plaintiff and the putative class members are thus entitled to damages for each month in which Westminster collected, or will collect, the Disputed Fees, including, at a minimum, either: (1) their actual damages or $500 per month, whichever is greater, if Westminster's conduct was not willful; or (2) three times their actual damages or $1,000 per month, whichever is greater, if Westminster's conduct was willful. Va. Code § 59.1-204.

109. Plaintiffs and the putative class are also entitled to their attorneys' fees and costs in prosecuting this action under Va. Code § 59.1-204.

110. And Plaintiffs and the putative class are entitled to injunctive relief enjoining the ongoing collection of the Disputed Fees under Va. Code §§ 59.1-203(C) and 59.1-205.

**COUNT TWO**
**VIOLATION OF VRTLA, Va. Code § 55.1-1220**
**(Class and Individual Claim by Plaintiffs against the Landlord Defendants)**

111. Plaintiffs incorporate each of the preceding allegations.

112. Under Federal Rule of Civil Procedure 23, Plaintiff Gonzales brings this claim against Defendant Fair Oaks, only, on behalf of himself and the following class of which he is a putative class member:

> All persons who: (1) executed a lease with Fair Oaks under which they (2) paid or were obligated to pay the Community Fee.

113. Under Federal Rule of Civil Procedure 23, the Spotswood Plaintiffs bring this claim against Defendant Spotswood, only, on behalf of themselves and the following class of which they are each a putative class member:

> All persons who: (1) executed a lease with Spotswood under which they (2) paid or were obligated to pay the Community Fee.

114. **Numerosity. Fed R. Civ. P. 23(a)(1)**. Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through Defendants' and third-parties' internal business records, and the class members may be notified of the pendency of this action by published or mailed notice.

115. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These

questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the Landlord Defendants are subject to the VRLTA; (2) whether the Landlord Defendants violated Va. Code § 55.1-1220 by evading their obligation to maintain a pest- and trash-free premises and forcing tenants to waive the warrant of habitability through the lease agreement; and (3) the appropriate amount of damages for the Landlord Defendants' conduct.

116. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

117. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate class representatives because their interests coincide with, and are not antagonistic to, the putative class members' interests. They have retained experienced and competent counsel; they intend to continue to prosecute the action vigorously; they and their counsel will fairly and adequately protect the interests of the members of the class; and they and their counsel have no interest that might cause them to not vigorously pursue this action.

118. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even class members could

afford it, individual litigation would be an unnecessary burden on the Court. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

119. The Landlord Defendants violated Va. Code § 55.1-1220 by forcing tenants to waive the warranty of habitability through the Community Fee.

120. Virginia law prohibits landlords from shifting the burden to their tenants to maintain safe, habitable, and sanitary common areas, because the warranty of habitability is an unwaivable guarantee under Va. Code § 55.1-220(A). *See Parrish v. Vance*, 898 S.E.2d 407, 411–14 (Va. Ct. App. 2024).

121. The Landlord Defendants' demand that their tenants pay the Community Fee is therefore a violation of the VRLTA.

122. Due to the Landlord Defendants' violations of the VRLTA, Plaintiffs are entitled, individually and on behalf of the classes defined in this Count (and with respect to the specified Landlord Defendant for each class), to their damages under Va. Code. § 55.1-1259, including, at minimum, the Community Fee payments that they and the putative class members have made thus far and will make during the pendency of the lawsuit. Plaintiffs and the putative classes are also entitled to an injunction enjoining collection of the Community Fee into the future.

## COUNT THREE
## VIOLATION OF VRTLA, Va. Code § 55.1-1222
## (Class and Individual Claim by Plaintiffs against the Landlord Defendants)

123. Plaintiffs incorporate each of the preceding allegations.

124. Under Federal Rule of Civil Procedure 23, Plaintiff Gonzales brings this claim against Defendant Fair Oaks, only, on behalf of himself and the following class of which he is a putative class member:

> All persons who: (1) executed a lease with Fair Oaks under which they (2) paid or were obligated to pay the Media Fee.

125. Under Federal Rule of Civil Procedure 23, the Spotswood Plaintiffs bring this claim against Defendant Spotswood, only, on behalf of themselves and the following class of which they are each a putative class member:

> All persons who: (1) executed a lease with Spotswood under which they (2) paid or were obligated to pay the Media Fee.

126. **Numerosity. Fed R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through Defendants' and third parties' internal business records, and the class members may be notified of the pendency of this action by published or mailed notice.

127. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the Landlord Defendants are subject to the VRLTA; (2)

whether the Landlord Defendants violated Va. Code § 55.1-1222 by assessing and collecting the Media Fee from their tenants; and (3) the appropriate amount of damages for the Landlord Defendants' conduct.

128. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

129. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate class representatives because their interests coincide with, and are not antagonistic to, the putative class members' interests. They have retained experienced and competent counsel; they intend to continue to prosecute the action vigorously; they and their counsel will fairly and adequately protect the interests of the members of the class; and they and their counsel have no interest that might cause them to not vigorously pursue this action.

130. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even class members could afford it, individual litigation would be an unnecessary burden on the Court. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and

factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

131. The Landlord Defendants violated Va. Code § 55.1-1222 by demanding and accepting payment from their tenants for television services when they were not the provider of that service.

132. The Landlord Defendants also violated Va. Code § 55.1-1222 by demanding and accepting payment of a "fee, charge, or other thing of value"—namely, bulk discounts that permitted them to substantially profit from the Media Fee—from the provider of a television service in exchange for giving their tenants access to the provider of such service.

133. The Landlord Defendants' demand that their tenants pay the Media Fee and acceptance of the same is therefore a violation of the VRLTA.

134. Due to the Landlord Defendants' violations of the VRLTA, Plaintiffs are entitled, individually and on behalf of the classes defined in this Count (and with respect to the specified Landlord Defendant for each class), to their damages under Va. Code. § 55.1-1259, including, at minimum, the Media Fee payments that they and the putative class members have made thus far and will make during the pendency of the lawsuit. Plaintiffs and the putative classes are also entitled to an injunction enjoining collection of the Media Fee into the future.

## COUNT FOUR
## VIOLATION OF VCPA, Va. Code § 59.1-200
## (Class and Individual Claim by Plaintiffs against the Landlord Defendants)

135. Plaintiffs incorporate each of the preceding allegations.

136. Under Federal Rule of Civil Procedure 23, Plaintiff Gonzales brings this claim against Defendant Fair Oaks, only, on behalf of himself and the following class of which he is a putative class member:

> All persons who: (1) executed a lease with Fair Oaks under which they (2) paid or were obligated to pay any of the Disputed Fees within the past two years.

137. Under Federal Rule of Civil Procedure 23, the Spotswood Plaintiffs bring this claim against Defendant Spotswood, only, on behalf of themselves and the following class of which they are each a putative class member:

> All persons who: (1) executed a lease with Spotswood under which they (2) paid or were obligated to pay any of the Disputed Fees within the past two years.

138. **Numerosity. Fed R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members' names and addresses can be identified through discovery, and the class members may be notified of the pendency of this action by published or mailed notice.

139. **Predominance of Common Questions of Law and Fact. Fed R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the Landlord Defendants made uniform misrepresentations and engaged in other unfair and deceptive practices in their form lease agreements in violation of the Act; (2) whether the Landlord Defendants' violations were willful; and (3) the appropriate amount of damages for the Landlord Defendants' violations.

140. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

141. **Adequacy of Representation. Fed R. Civ. P. 23(a)(4).** Plaintiffs are adequate class representatives because their interests coincide with, and are not antagonistic to, the putative class members' interests. They have retained experienced and competent counsel; they intends to continue to prosecute this action vigorously; they and their counsel will fairly and adequately protect the interests of the members of the class; and they and their counsel have no interest that might cause them to not vigorously pursue this action.

142. **Superiority. Fed R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to the other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the Court. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant Westminster Management's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court

by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

143. The Landlord Defendants violated the VCPA, Va. Code § 59.1-200, with respect to the class members at their respective properties, by, at a minimum:

a. Representing to Plaintiffs and the putative class members that Defendants can charge, and Plaintiffs owe, a Community Fee, when in fact such services are guaranteed and unwaivable under the Virginia warranty of habitability as part of their right to a safe and habitable premises and clean and orderly common spaces;

b. Representing to Plaintiffs and the putative class members that Defendants can charge, and Plaintiffs owe, a Media Fee for television services, when in fact Virginia law prohibits landlords for charging for television services unless they are themselves the provider of the services;

c. Representing to Plaintiffs and the putative class members the Media Fee covers certain Standard Amenities, when in fact the Fee is set far higher than the costs of those services and in fact generates additional profits for Defendants that are never disclosed to Plaintiffs or the class members;

d. Representing to Plaintiffs and the class members that the Community Fee is merely for the cost of "service to [their] dwelling" units, when in fact Defendants knew at the time they made such representation that the Community Fee did not cover services to the dwelling but in fact covered common area services and maintenance;

e. Representing to Plaintiffs and the putative class members that the Community Fee was merely a flat rate "allocat[ion]" of the "bills . . . billed by the service provider to us," when in fact Defendants knew at the time they made this representation that it each Fee was set not based on the actual costs of the services but based on the maximum possible profit Defendants could generate from the Community Fee;

f. Representing to Plaintiffs and the putative class members that Community Fee is a "fair and reasonable" estimation of the costs of the services covered by the Fee, when in fact Defendants knew at the time they made this representation that the Fee was set not based on the actual costs of the services but based on the maximum possible profit they could generate from the Fee based on surveys of market competitors;

g. Representing to Plaintiffs and the putative class members that the Community Fee and/or Admin Fee merely cover certain services—i.e., have certain uses and benefits—when in fact they are specifically set by Defendants at prices far higher than the actual costs of those services—or that cover no actual services at all; and,

h. Representing to Plaintiffs and the putative class members that the Community Fee are merely "utilities" that may be passed on to the tenants under Virginia law, when in fact that is not the case.

144. The above affirmative misrepresentations and material omissions constitute, at a minimum, violations of Va. Code 59.1-200(5) and (6), insofar as they misrepresent that the

goods and services provided by the fees have certain qualities, characteristics, uses or benefits, or are of a particular standard, quality, grade, style, or model. They also constitute a "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction," in violation of Va. Code § 59.1-200(14).

145. The above misrepresentations and material omissions are not an aspect of a consumer transaction subject to the Virginia Residential Landlord Tenant Act, as the VRLTA does not cover the conduct at issue—i.e., making misrepresentations in lease agreements—and the VCPA explicitly covers misrepresentations and other acts by a landlord that violate § 59.1-200.

146. "The VCPA creates a new, statutory cause of action distinct from and in addition to common law fraud." *Ballagh v. Fauber Enters.*, 290 Va. 120, 124 (2015) (citing *Owens v. DRS Auto. Fantomworks, Inc.,* 288 Va. 489, 497, 764 S.E.2d 256, 260 (2014) ("[T]he legislative purpose underlying the VCPA was, in large part, to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by the common law.... Therefore, [it] extends considerably beyond fraud.")). The elements "of the two claims are [therefore] different." *Id.* The VCPA applies to *both* misrepresentations and fraudulent acts by landlords in relation to a lease agreement, as outlined in § 59.1-200. Va. Code § 59.1-199(5). With respect to misrepresentations under the VCPA, a plaintiff need only show (1) reliance and (2) damages. *In re Lumber Liquidators Litig.*, No. 1:16-md-2743, 2017 WL 29111681, at *12-13 (E.D. Va. July 7, 2017) (Trenga, J.). There is no requirement that the plaintiff establish the defendant's knowledge of the falsity or an intent to deceive, though the plaintiff may seek damages for willful violations. *See id.*

147. Here, Plaintiffs and the putative class members relied on the representation that they were required to pay the Disputed Fees when they signed their lease agreements and agreed to pay and paid the fees in the amount provided under those agreements. Plaintiffs and the class members would not have paid the Disputed Fees but for Defendants' representation that they were owed and that they had certain uses and benefits.

148. Plaintiffs and the putative class members have been damaged by the Landlord Defendants' misrepresentations and material omissions, including through payment of the Disputed Fees in reliance on Defendants' representation that they were owed and would have certain uses and benefits.

149. As set forth above, the Landlord Defendants' violations were willful.

150. Plaintiffs are entitled, individually and on behalf of the classes defined in this Count (and with respect to the specified Landlord Defendant for each class), to damages for each month in which the Landlord Defendants collected, or will collect, the Disputed Fees, including, at a minimum, either: (1) their actual damages or $500 per month, per fee, whichever is greater, if their conduct was not willful; or (2) three times their actual damages or $1,000 per month, per fee, whichever is greater, if their conduct was willful. Va. Code § 59.1-204.

151. Plaintiffs and the putative classes are also entitled to their attorneys' fees and costs in prosecuting this action under Va. Code § 59.1-204.

152. And Plaintiffs and the putative classes are entitled to injunctive relief enjoining the ongoing collection of the Disputed Fees under Va. Code §§ 59.1-203(C) and 59.1-205.

WHEREFORE, Plaintiffs demand judgment for actual, statutory, and punitive damages against Defendants; injunctive relief; their attorneys' fees and costs; pre- and post-judgment interest at the legal rate; and such other relief the Court considers proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PLAINTIFFS**

By:____*/s/ Kristi C. Kelly*____________

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew G. Rosendahl, VSB #93738
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiffs*